Evan J. Smith (SBN242352)
BRODSKY & SMITH, LLC
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160
esmith@brodskysmith.com

*Attorneys for Plaintiff*

*[Additional Counsel Appears on Signature Page]*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANN NOYES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SIGMA DESIGNS, INC., ELIAS NADER, J. MICHAEL DODSON, MARTIN MANNICHE, THINH TRAN, PETE THOMPSON, and SILICON LABORATORIES INC.,<br><br>Defendants. | Case No.:<br><br><u>CLASS ACTION</u><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Ann Noyes ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## **NATURE OF THE ACTION**

1. Plaintiff brings this class action on behalf of the public stockholders of Sigma Designs, Inc. ("Sigma" or the "Company") against current and former members of Sigma's Board of Directors (the "Transaction Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Transaction Board's attempt to sell certain

assets of the Company to Silicon Laboratories Inc. ("Silicon Labs").

2. Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on February 23, 2018. The Proxy recommends that Sigma stockholders vote in favor of a proposed transaction whereby Sigma's Z-Wave business is acquired by Silicon Labs.

3. On December 7, 2017, Sigma and Silicon Labs announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Silicon Labs would acquire all of the outstanding shares of common stock of Sigma for $7.05 per share. The Merger Agreement included provisions whereby if specific contracts were not terminated by January 22, 2018, if Sigma's TV business was not sold or shut down by December 14, 2017, or if the Company did not have $40 million in cash by January 23, 2018, then Sigma would sell its Z-Wave business to Silicon Labs for $240 million (the "Asset Sale"). On January 23, 2018, Sigma disclosed that it had failed to meet the conditions for the merger and, instead, would be moving forward with the Asset Sale.

4. The Transaction Board conducted an extended, slow-moving process to consider strategic alternatives. Yet when the time came to enter into the Merger Agreement, the Transaction Board agreed to the Asset Sale provision without a fairness opinion, any financial analyses on the Asset Sale, or a plan for what to do if the merger fell apart. The conditions that would trigger the Asset Sale had unreasonable deadlines attached to them, making it almost impossible for Sigma to meet those conditions. For example, Sigma had just one week after the signing of the Merger Agreement to complete a sale of or wind down its Smart TV and set-top box businesses. Even if the Transaction Board believed a sale of those businesses would occur, agreeing to a one-week time frame to finish negotiations and enter into a definitive agreement was far more than optimistic, it was practically impossible.

5. Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the

sales process, financial projections prepared by Sigma management, as well as the financial analyses conducted by Deutsche Bank Securities Inc. ("Deutsche Bank"), Sigma's financial advisor.

6. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Sigma's stockholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Sigma's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

7. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Sigma.

8. Defendant Sigma is a corporation organized and existing under the laws of the State of California. The Company's principal executive offices are located at 47467 Fremont Blvd, Fremont, California 94538. Sigma common stock trades on NASDAQ under the ticker symbol "SIGM." Sigma has two business lines: semiconductor technologies for Internet of Things products, and technologies for Smart TVs and set-top boxes.

9. Defendant Elias Nader has been Interim President and CEO of the Company since January 26, 2018, Chief Financial Officer since April 2014 and a director of the Company since February 25, 2018.

10. Defendant J. Michael Dodson has been a director of the Company since July 2013 and has been Lead independent Director since January 2014.

11. Defendant Martin Manniche has been a director of the Company since February 2014.

12. Defendant Thinh Tran served as President and CEO and was a director of Sigma from 1982 to January 26, 2018.

13. Defendant Pete Thompson was a director of the Company from December 2013 to January 19, 2018.

14. Defendants Dodson, Manniche, Tran and Thompson are collectively referred to herein as the "Transaction Board."

15. Defendant Silicon Laboratories Inc. is a Delaware corporation with its principal executive offices located at 400 West Cesar Chavez, Austin, Texas 78701.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

17. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Sigma maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**CLASS ACTION ALLEGATIONS**

19. Plaintiff brings this action on her own behalf and as a class action on behalf of all owners of Sigma common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

20. This action is properly maintainable as a class action for the following reasons:

- 4 -
CLASS ACTION COMPLAINT

(a) The Class is so numerous that joinder of all members is impracticable. As of December 6, 2017, Sigma had approximately 38.7 million shares outstanding.

(b) Questions of law and fact are common to the Class, including, inter alia, the following:

    (i) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

    (ii) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

    (iii) Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

    (iv) Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

    (v) whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c) Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d) Plaintiff's claims are typical of those of the other members of the Class.

(e) Plaintiff has no interests that are adverse to the Class.

(f) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g) Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h) Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

**A. Sigma Meanders its way to Liquidation**

21. Sigma produces semiconductor technologies for Internet of Things products and Smart TVs. The Internet of Things business includes wireless chips, modules and mesh networking protocol, while the Smart TV business includes media processor chips, home networking controllers and post-processing products.

22. The Transaction Board began a process to consider strategic alternatives for Sigma in January 2016, after receiving an indication of interest from Company A to acquire Sigma for $7.85 per share. The process ended in December 2017, when the Transaction Board agreed to sell the Company to Silicon Labs for $7.05 per share unless certain conditions were not met, in which case Sigma would sell its Z-Wave business to Silicon Labs for $240 million.

23. By April 2016, Sigma had received multiple offers for the purchase of the Company, with one as high as $11.25 per share. The Transaction Board decided to request additional bids from the three interested parties at that time, including Silicon Labs, and reach out to other potential parties. One of the parties withdrew from the process. New offers were made in July 2016, the highest being $9.75 per share to acquire Sigma. The Board decided that the offers were not high enough. September 2016 brought another offer from a previous bidder, this one at $11.00 per share. Despite concern with some uncertainty with the offer, and a threat to terminate due diligence with the bidder, the Transaction Board appears to have let the offer languish. At the end of 2016, Sigma remained a stand-alone company.

24. At its first meeting in 2017, on February 3, the Transaction Board discussed how the bidders for the Company, which included Silicon Labs, "either lacked interest or carried to

[sic] much financing or regulatory risk." That is when the Transaction Board decided to evaluate divestitures as a potential way to maximize stockholder value. Over the course of the next ten months, Sigma received a number of offers to purchase the Company's business units and the Company as a whole. The Proxy does not reveal the details of some of these offers. By December 2017, Sigma had agreed to sell its wholly-owned subsidiary, which operated the Company's wired connectivity business, and was negotiating the sale of the Company to Silicon Labs.

25. On December 7, 2017, after three months of negotiations, Sigma and Silicon Labs entered into the Merger Agreement.

26. The Merger Agreement included a provision for the Asset Sale, which had been negotiated and agreed to within days of the agreement being signed. But the Transaction Board had been aware of Silicon Labs focus on the Company's Z-Wave business for well over a year. In March 2016, Silicon Labs informed Deutsche Bank that it was interested in acquiring the Z-Wave business, not the whole company. A revised bid from Silicon Labs in April 2016 offered $200 million to purchase Sigma's Internet of Things businesses. A Transaction Board meeting on September 16, 2016 included a discussion of Silicon Labs' interest in acquiring certain Sigma businesses, not the whole company. After months of silence, in July 2017 Silicon Labs sent Sigma an expression of interest concerning the purchase of the Z-Wave business. And one week after entering into an exclusivity agreement, Silicon Labs requested permission to speak to third parties about acquiring Sigma's Smart TV business.

27. Given Silicon Labs' interest in the Z-Wave business, which continued during its negotiations of the Merger Agreement, the Transaction Board should have requested financial analyses of the Z-Wave business from Deutsche Bank at some point between August 2017 and December 2017. No such analysis was provided. Between December 4 and December 7, 2017, the companies negotiated the Asset Sale. In a meeting on December 6, 2017, the Transaction Board discussed "certain financial information related to" the Asset Sale, but in a meeting the next day decided not to request a fairness opinion because there was a "limited amount of time" to do so. Proxy at 54. Instead, the Transaction Board relied on "its own belief and judgment, taking into account preliminary feedback from representatives of Deutsche Bank, as to the relative value"

of the Asset Sale. *Id*.

28. Ultimately, Sigma could not comply with the conditions for a merger and the Asset Sale provision was invoked. The Transaction Board is planning to liquidate and wind down the Company after the Asset Sale is completed, something discussed for the first time on January 21, 2018. The future of the Company, or lack thereof, was decided by an uninformed Transaction Board when it agreed to the Asset Sale provision without any financial analysis by Deutsche Bank.

**B. The Materially Incomplete and Misleading Proxy**

29. The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to Sigma stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

30. On February 23, 2018, Defendants filed the Proxy with the SEC. A main purpose of the Proxy is to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Sigma stockholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

*Materially Misleading Statements/Omissions Regarding the*
*Management-Prepared Financial Forecasts*

31. The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of Deutsche Bank's fairness opinion, Deutsche Bank reviewed "certain internal analyses, financial forecasts and other information relating to the Z-Wave Business and Sigma prepared by management of Sigma." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Sigma provided to the Transaction Board and Deutsche Bank.

32. Notably, Defendants failed to disclose the IoT Business Projections and the January 2018 Projections, restated on a calendar year basis for years 2018 through 2023, including: revenue; gross profit; EBITDA; stock-based compensation expense; cash taxes; changes in net working capital; capital expenditures; unlevered free cash flow; and NOL utilization schedule.

This omitted information is necessary for Sigma stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

***Materially Incomplete and Misleading Disclosures Concerning***

***Deutsche Bank's Financial Analyses***

33. First, with respect to the *Selected Companies Analysis,* the Proxy fails to disclose whether Deutsche Bank performed any type of benchmarking analysis for the Z-Wave Business in relation to the selected public transactions.

34. Second, with respect to the *Selected Transactions Analysis*, the Proxy fails to disclose the individually observed multiples for each of the selected transactions. The Proxy also fails to disclose whether Deutsche Bank performed any type of benchmarking analysis for the Z-Wave Business in relation to the selected public transactions.

35. Finally, with respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the individual inputs and assumptions utilized by Deutsche Bank to derive the discount rate range of 13.5% to 14.5%. The Proxy also fails to disclose the specific factors that make the cash flows associated with only the Z-Wave Business inherently riskier than the cash flows associated with IoT projections used in the December 7, 2017 opinion. In addition, the Proxy fails to disclose the implied terminal revenue multiple range resulting from the analysis. Finally, the Proxy fails to disclose the basis for Deutsche Bank to utilize calendar year projections, rather than management's fiscal year projections, for the analysis.

***Materially Incomplete and Misleading Disclosures Concerning the***

***Flawed Process***

36. The Proxy also fails to disclose material information concerning the sales process. As an initial matter, the Proxy fails to disclose the amount of money that will be distributed to stockholders if the Proposed Transaction closes. The Proxy states that there is a risk that liabilities or obligations that crop up during the dissolution process might reduce, delay or even prevent any distributions to stockholders, but no other information is provided concerning the expected costs of dissolution and the expected distribution to stockholders.

37. Throughout the sales process, Sigma's management prepared financial forecasts and projections and presented those to the Transaction Board. The Proxy does not disclose those forecasts or projections, including those presented to the Transaction Board on February 17, 2016, February 26, 2016, July 15, 2016, July 28, 2016, August 18, 2016 (if different from July 28, 2016 or February 26, 2016 projections), February 12, 2017, February 24, 2017, August 3, 2017, August 8, 2017, November 22, 2017. In addition, the Proxy fails to disclose whether the Company's "current set of projections" as of November 22, 2017 had been updated as discussed at the meeting of the Transaction Board on November 22, 2017.

38. Throughout the sales process, the Transaction Board, Deutsche Bank and Sigma's management spoke with "various parties" concerning divestitures of Sigma's business lines or an acquisition of the Company. However, the Proxy fails to disclose pertinent information concerning those parties. In particular, the Proxy fails to disclose the total number of parties spoken to, how many of those parties were strategic parties and how many were financial parties, whether any of the parties contacted in 2017 had been part of the process in 2016, the interest of each party concerning a sale of the Company or a sale of specific business lines, and the number of offers to purchase each of Sigma's business lines.

39. The Company received a number of indications of interest and proposals throughout the sales process. Yet the details of some of those proposals are not disclosed in the Proxy. Specifically, the Proxy fails to disclose the details of: (a) Company F's non-binding letter of intent on June 2, 2017 to acquire Sigma's set-top box business; (b) Company F's non-binding letter of intent on June 29, 2017 for a licensing transaction; (c) Company E's non-binding indication of interest on October 5, 2017 to acquire Sigma's wired connectivity business; (d) Integrated Silicon Solution, Inc. ("ISSI")'s non-binding indication of interest on October 6, 2017 to acquire Sigma's wired connectivity business; (e) Company E's revised non-binding indication of interest on October 9, 2017 to acquire Sigma's wired connectivity business; (f) Sigma's letter of intent to Company I on October 24, 2017 to sell Sigma's Smart TV and set-top box businesses; (g) ISSI's letter of intent on November 1, 2017 to purchase the shares of Sigma's wholly-owned subsidiary Sigma Designs Israel S.D.I. Ltd; (h) Company I and Sigma's preliminary, non-binding

term sheet of December 1, 2017 for the purchase of Sigma's Smart TV and set-top box businesses; (i) Defendant Tran's non-binding proposal on December 29, 2017 to acquire Sigma's Smart TV and set-top box businesses; (j) Defendant Tran's non-binding letter of intent on January 5, 2018 to acquire Sigma's Smart TV and set-top box businesses; (k) Sigma's response letter of intent to Defendant Tran on February 3, 2018 concerning the purchase of Sigma's Smart TV and set-top box businesses; and (l) Defendant Tran's response letter of intent on February 6, 2018 related to his offer to acquire Sigma's Smart TV and set-top box businesses.

40. The Proxy notes that as of December 6, 2017, eight companies had presented offers to acquire Sigma, and multiple offers had been made to purchase certain of Sigma's businesses. On a number of occasions, Deutsche Bank presented to and/or discussed with the Transaction Board preliminary financial analyses. However, the Proxy fails to disclose the vast majority of those analyses, including those from the Transaction Board meetings on February 26, 2016, March 22, 2016, August 18, 2016, March 31, 2017, June 12, 2017, August 17, 2017, and December 6, 2017.

41. The Transaction Board negotiated the Merger Agreement beginning in early September 2017. The Proxy does not disclose when the Transaction Board agreed to a deadline of December 14, 2017 to divest or wind down its Smart TV and set-top box businesses, if the Transaction Board negotiated to change that deadline before entering into the Merger Agreement on December 7, 2017, and the basis for determining one week would be enough time to divest or wind down those business lines.

42. Finally, the Proxy fails to disclose if Deutsche Bank had any relationships with Sigma or Silicon Labs in the two years prior to the Merger Agreement, any previous or current work conducted by Deutsche Bank for either Sigma or Silicon Labs or the amount of compensation earned by Deutsche Bank for any such previous or current work or relationships.

43. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Sigma

stockholders are unable to make a fully informed decision in connection with the Asset Sale and face irreparable harm, warranting the injunctive relief sought herein.

44. In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Asset Sale and contains the materially incomplete and misleading information discussed above.

45. Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

46. Further, the Proxy indicates that on February 15, 2018, Deutsche Bank reviewed with the Transaction Board its financial analysis of the Asset Sale and delivered to the Transaction Board an oral opinion, which was confirmed by delivery of a written opinion that same day, to the effect that the Asset Sale was fair, from a financial point of view, to Sigma stockholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Deutsche Bank's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

47. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. Defendants have filed the Proxy with the SEC with the intention of soliciting Sigma

CLASS ACTION COMPLAINT

stockholder support for the Asset Sale.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

50. In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Sigma, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

51. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

52. Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the financial analyses performed by Deutsche Bank in support of its fairness opinion; and (iii) the sales process.

53. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Asset Sale; indeed, the Proxy states that Deutsche Bank reviewed and discussed its financial analyses with the Transaction Board on February 15, 2018, and further states that the Transaction Board relied upon Deutsche Bank's financial analyses and fairness opinion in connection with approving the Asset Sale.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

54. The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Asset Sale. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **COUNT II**

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

55. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

56. The Individual Defendants acted as controlling persons of Sigma within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sigma and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

57. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Transaction Board prior to voting on the Asset Sale. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Asset Sale. They were, thus, directly involved in the making of the Proxy.

- 14 -
CLASS ACTION COMPLAINT

59. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

60. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and her counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Sigma stockholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Asset Sale, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D. In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

- 15 -
CLASS ACTION COMPLAINT

E. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 15, 2018

BRODSKY & SMITH, LLC

*/s/*

Evan J. Smith
Marc L. Ackerman
9595 Wilshire Boulevard
Suite 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160
esmith@brodsky-smith.com
mackerman@brodsky-smith.com

**OF COUNSEL:**

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514

- 16 -
CLASS ACTION COMPLAINT